IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **DARLENE JENKINS**  *Plaintiff*,  v.  **LNL HOME SERVICES, LLC,**  *Defendant*. | **CIVIL ACTION**  NO. 23-423 |

Baylson, J.                                                                                                       July 22, 2025

**MEMORANDUM OPINION RE: DEFENDANT'S SUMMARY JUDGMENT MOTION**

Plaintiff, Darlene Jenkins ("Jenkins"), brings employment and racial discrimination claims against Defendant, her former employer LNL Home Services ("LNL"). Presently before the Court is LNL's Motion for Summary Judgment. For the reasons explained below, LNL's Motion is denied.

I.  **FACTUAL BACKGROUND**

LNL provides residential services to individuals with intellectual developmental disabilities. Defendant's Statement of Undisputed Material Facts ("Def. Facts.") at ¶ 1, ECF 57-3. Jenkins was hired at LNL as a CPR and first aid instructor in September 2020. Pl. Ex. F at ¶ 3, ECF 61-7. During her time at LNL, Jenkins' role adopted to take on various other functions including hiring, onboarding, training, payroll, and regulatory compliance. Defendant's Response to Plaintiff's Additional Facts ("Def. Facts II") at ¶ 5, ECF 72. Jenkins was eventually promoted to Assistant Executive Director. Motion for Summary Judgment ("MSJ") at 17, ECF 57-2. Jenkins resigned from LNL on April 7, 2021, in an email to staff she wrote, "I felt the need to inform everyone of this because there are issues and concerns that have come to my attention and as part of my due diligence and concerns I must inform the appropriate parties." Pl. Ex. E at 6, ECF 61-6. This case stems from Jenkins' experiences while working at LNL. Namely,

1

Jenkins contends that she experienced a hostile work environment and racial discrimination and that LNL unlawfully withheld her wages, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C § 1981 ("§ 1981"), and the Pennsylvania Wage Payment and Collection Law ("WPCL").

**Hostile Work Environment & Racial Discrimination**

The parties agree that Jenkins conducted trainings on workplace harassment, sexual harassment, and discrimination policies. Plaintiff's Response to Defendant's Statement of Undisputed Facts ("Pl. Facts") at ¶ 26, ECF 61-1. The parties also agree that Jenkins was responsible for hiring seven black employees. Id. at ¶¶ 33. Further, the testimony of two LNL CEO's, Donna Bouclier ("Bouclier") and her successor, Gamal Napper-Preston ("Preston") are undisputed in key regards. The parties agree that Bouclier testified that Allouche accused Jenkins of being lazy and told Jenkins to "get the fuck off her ass." Def. Facts II at ¶¶ 40, 41. The parties likewise agree that Preston testified that Allouche kept a gun holstered to his hip at all times and laughed about providing a resident with a knife, knowing that the resident was specifically prohibited from accessing sharp objects. Id. at ¶¶ 37, 39. Similarly, the parties do not dispute that Jenkins testified that Allouche told her that Bouclier was going to be "the face of the company because she's white and it would be more appeasing." Id. at ¶ 11. Nor do they dispute that Jenkins testified that she told Allouche that hiring should be based on qualifications, not race. Pl. Facts at ¶ 35.

However, the parties dispute whether Jenkins ever reported racial harassment. While LNL contends that Jenkins never reported any harassment, Jenkins testified that she reported Allouche's racial discrimination in an email to Bouclier. Pl. Facts at ¶ 26. And, Bouclier testified that she heard Allouche refer to Jenkins as a "monkey" and make other racially charged

statements, such as "I can't believe – look at the way they are acting. Is this the way black people act?" Pl. Ex. B ("Bouclier Dep.") at 52:20 – 53:17, ECF 61-3. LNL also disputes certain aspects of Jenkins' testimony, including that Allouche referred to Jenkins and another black employee as "black monkeys and dogs." Resp. at ¶ 15 (citing Pl. Ex. A ("Jenkins Dep.") at 458:17-22; 468:1-18, ECF 61-2)). Allouche denies using these terms and LNL contends that even if such terms were used it "was a single instance that occurred after Plaintiff submitted her resignation." Def. Facts II at ¶ 17. LNL also disputes Jenkins' testimony that Allouche's wife, Zalina Allouche, physically pushed Jenkins and called her a "black bitch." Resp. at ¶ 15 (citing Jenkins Dep. at 499:13-500:14, 512:19-513:8); Def. Facts II at ¶ 17.

**Unpaid Wages**

The parties agree that Allouche provided Jenkins money "to help her personally and to help her husband get his driver's license restored." Pl. Facts at ¶ 29. The parties further agree that Jenkins agreed to repay Allouche through her LNL wages. Id. It is also undisputed that other LNL employees, including Bouclier and Preston, testified that they were not paid their entire wages. Def. Facts II at ¶¶ 31, 33. The parties also largely agree as to the wages that Jenkins received from LNL. Jenkins contends that she only received three or four paychecks and LNL similarly asserts that Jenkins received five paychecks in total. Def. Facts II at ¶ 29. Payroll records submitted by LNL show that Jenkins received by-weekly $1,000 payments from September 20, 2020, through December 26, 2020. Def. Ex. 4, ECF 57-9. LNL also submitted payroll records that show that Jenkins received five payments of $2,115. Def. Ex. 5, ECF 57-10.

However, the parties dispute how much LNL owes Jenkins in wages. Jenkins testified that she is owed $33,000 in unpaid wages, whereas LNL contends that Jenkins was paid all money that she was owed. Def. Facts II at ¶ 30.

3

II.     **PROCEDURAL HISTORY**

Jenkins initiated this action on February 2, 2023, by filing a Complaint in this Court. ECF 1. The Complaint asserts four claims: (1) Title VII Race Discrimination (Count II), (2) § 1981 Race Discrimination (Count III), (3) Title VII (Count I) and § 1981 (Count III) Hostile Work Environment, and (4) Pennsylvania WPCL Violations (Count IV).

On September 11, 2024, LNL moved to consolidate this matter with Okeke v. LNL Home Services, No. 21-4750, a related case then pending before the undersigned in which LNL was also a defendant. ECF 34. Jenkins filed a Response in opposition to consolidation on September 25, 2024. ECF 41. The Court denied LNL's Motion to Consolidate on October 16, 2024. ECF 46.

On January 27, 2025, LNL filed the instant Motion for Summary Judgment. ECF 57. Jenkins filed an opposition on March 6, 2025. ECF 61. LNL filed a Reply on March 13, 2025. ECF 62. Jenkins then filed a Surreply on March 24, 2025. ECF 65.

In reviewing the summary judgment record, the Court identified deficiencies in LNL's payroll documentation relevant to Jenkins' Title VII claims. On April 29, 2025, the Court ordered LNL to respond to Jenkins' Statement of Material Facts and to produce all payroll records covering the duration of Jenkins' employment. ECF 69. On May 23, 2025, LNL submitted two additional payroll records. ECF 72. However, the production remained incomplete, and on May 27, 2025, the Court ordered LNL to produce all payroll records for calendar years 2020 and 2021, the years of Jenkins' employment. ECF 73.

On June 6, 2025, LNL requested a two-week extension to comply with the Court's directive. ECF 74. The request was granted. ECF 75. On June 20, 2025, LNL again sought additional time. ECF 76. In light of the repeated delays, the Court ordered the parties to

participate in an unrecorded status conference on June 21, 2025. ECF 77. Following the status conference, the Court issued an Order summarizing the discussion and reiterating the Court's expectations. ECF 78.

In that Order, the Court observed that LNL's continued failure to produce complete payroll records created a genuine dispute of material fact as to whether LNL employed the minimum number of employees necessary to be subject to Title VII liability. ECF 78. The Court also stated that it was likely to find a genuine dispute of fact regarding Jenkins' classification as an independent contractor. Id.

### III.  LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A factual dispute is "material" if it might affect the outcome of the case under governing law. Id.

A party seeking summary judgment always bears the initial responsibility for informing the district court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Where the non-moving party bears the burden of proof on a particular issue at trial, the moving party's initial burden can be met simply by "pointing out to the district court that there is an absence of evidence to support the non-moving party's case." Id. at 325. After the moving party has met its initial burden, the adverse party's response must, by "citing to particular parts of materials in the record," show that a fact is "genuinely disputed." Fed. R. Civ. P. 56(c)(1). Summary judgment is appropriate if the non-moving party fails to rebut by making a

factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322. Under Rule 56, the Court must view the evidence presented on the motion in the light most favorable to the opposing party. Anderson, 477 U.S. at 255.

## IV. DISCUSSION

Jenkins brings claims under Title VII, § 1981, and the Pennsylvania WPCL. For the reasons explained below, the Court finds that there are disputed issues of material fact relevant to each claim and as such denies LNL's Motion for Summary Judgment.

### A. Title VII Racial Discrimination (Count II)

Title VII racial discrimination claims are analyzed under the burden shifting framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). See Titus-Morris v. Bank of Am. Card Serv. Corp., 512 Fed. App'x 213, 216-217 (3d Cir. 2013) (non-precedential) (per curiam). Under the McDonnell Douglas framework, plaintiffs bear the initial burden of establishing a prima facie Title VII violation, after which the burden shifts to the employer to articulate a legitimate non-discriminatory reason for the employment action, if such a reason is provided, the plaintiff then has an opportunity to prove, by a preponderance of the evidence, that the employer's proffered reason is pretext. See Jones v. Sch. Dist. of Phila., 198 F.3d 403, 410 (3d Cir. 1999).

Notably, Title VII only protects employees whose employers have employment relationships with fifteen or more individuals. Before analyzing Jenkins' prima facie case, the Court must address whether (1) Jenkins was misclassified as an independent contractor, and (2) LNL had more than fifteen employees during the years of Jenkins' employment.

### 1. Independent Contractor

Title VII defines an employee as "an individual employed by an employer." 42 U.S.C. § 2000(e)(f). In Brown v. J. Kaz, Inc., the Third Circuit adopted the standard articulated by the Supreme Court in Darden, a case arising under ERISA, to Title VII employment status determinations. 581 F.3d 175, 179-180 (3d Cir. 2009). The Third Circuit held that "the question of whether an individual is an employee turns on the 'hiring party's right to control the manner and means by which the product is accomplished.'" Id. at 180 (quoting Nationwide Mut. Ins. Co. v. Darden, 503 U.S. 318, 323 (1992)). The factors relevant to this inquiry include:

> The skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party.

Id. (quoting Darden, 503 U.S. at 323-324). The parties agree that Jenkins was required to work at LNL's office from 9-5, Monday through Friday, and was sometimes required to stay later. Def. Facts II at ¶ 2. The parties further agree that LNL provided Jenkins with an on-site office and a computer. Id. Likewise, it is undisputed that Jenkins "directed most activities at LNL" and that Bouclier was "pretty much a figurehead." Id. at ¶ 3. It is also undisputed that Jenkins was responsible for a host of critical areas including hiring, onboarding, training, payroll, accessing the Home Community Services and Supports Directory, contacting support organizations, and advising Allouche on relevant regulations and providing regulatory

compliance training to other staff. Id. at ¶ 5. Similarly, the parties agree that Jenkins drafted many, if not all, of LNL's job descriptions, policies, procedure manuals, and county documents. Id. at ¶ 8. Further, it is undisputed that Jenkins was paid, or was supposed to be paid, bi-weekly, via direct deposit. Id. at ¶ 29.

Thus, the parties agree that LNL provided Jenkins the tools needed to complete her work, LNL controlled the location and manner of Jenkins' work, Jenkins' role required a sophisticated skill set, Jenkins' work was part of LNL's regular business, Jenkins was very involved in hiring and paying other employees, and Jenkins was paid by time. In fact, LNL only asserts three factors that that support a finding that Jenkins was an independent contractor, that Jenkins (1) performed work for other agencies while working at LNL, Def. Facts II at ¶ 2, (2) was listed as an independent contractor on payroll records, Def. Facts at ¶ 7, and (3) did not sign a written employment contract, id. at ¶ 5.

The record presents a genuine factual dispute as to whether Jenkins was misclassified as an independent contractor. As such, the Court will not grant summary judgment on Jenkins' Title VII claims on this basis.

### 2. Fifteen Employees

Title VII applies to any employer who "has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year." Walters v. Metro. Educ. Enters., Inc., 519 U.S. 202, 204 (1997) (quoting 42 U.S.C. § 2000e(b)). Title VII's fifteen-employee threshold is a substantive element of a Title VII claim. See Nesbit v. Gears Unlimited, Inc., 347 F.3d 72, 76-77 (3d Cir. 2003). In Walters, the Supreme Court held that the payroll method is the preferred way to determine whether an employer has an employment relationship with an individual. 519 U.S. at 207. That is, whether an employer had

fifteen or more individuals on their payroll for each of twenty or more weeks during the year in question.

As explained, LNL failed to produce complete payroll records for the years in question, 2020 and 2021. As such, the Court found that whether LNL had employment relationships with at least fifteen individuals for each of twenty or more weeks in 2020 and 2021 is a factual dispute best left for the jury. The Court will not grant summary judgment on Jenkins' Title VII claims on this basis.

### 3. Prima Facie Case

"In McDonnell Douglas, the Court noted that the facts necessary to establish a prima facie case of racial discrimination are flexible in Title VII cases, and will vary to reflect the differing circumstances of each situation." Dickerson v. State of N.J. Dep't of Human Servs., 767 F.Supp. 605, 616 (D.N.J. 1991). To establish a prima facie case of race discrimination in a constructive discharge claim, a plaintiff must show that she was (1) a member of a protected class, (2) qualified for the position she held and was performing it satisfactorily, (3) constructively discharged, despite her qualifications, and (4) discharged while other employees not in her protected class were retained. See McWilliams v. Western Pa. Hosp., 717 F.Supp. 351, 354 (W.D. Pa. 1989).

Taking each element in turn, it is undisputed that Jenkins, a Black woman, is a member of a protected class.

Turning to the second element, Jenkins was qualified to perform the role of CPR and first aid instructor and later Assistant Executive Director. Jenkins oversaw hiring, onboarding, training, payroll, first aid training, and compliance with state licensing. Def. Facts II at ¶ 5. LNL does not dispute that Jenkins was "very competent" and "ran the show." Id. at ¶ 6.

However, the parties dispute whether Jenkins was qualified to be CEO. The Court notes that consistent with the Pennsylvania statute governing community homes for individuals with intellectual disabilities, Jenkins was presumptively unqualified to be CEO because she does not possess a college degree. See 55 Pa. Code. § 6400.43; MSJ at 13. At the same time, Bouclier testified that "ODP changed their rules . . . in regards to qualifications," meaning that Jenkins "could have been the CEO as long as there were other people who were hired to be in executive management who did possess that qualification [college degree]." Bouclier Dep. at 37:16-39:15.

The third element requires Jenkins to have experienced an adverse employment action. LNL characterizes Jenkins' asserted adverse employment action as its decision not to promote Jenkins to CEO or *de facto* CEO. MSJ at 15-16. Jenkins, however, does not describe her claim as such. Rather, Jenkins asserts that she faced an adverse employment action not when she was passed over for CEO, but when she was constructively discharged due to being misclassified as an independent contractor, not paid properly, targeted with racial slurs and remarks, told not to hire black employees, and subjected to racial animus when Allouche purposefully decided to hire a white person to be the face of the company. Resp. at 15-16.

To establish constructive discharge, an employee must show that her employer "knowingly permitted conditions of discrimination in employment so intolerable that a reasonable person subject to them would resign." Goss v. Exxon Office Sys. Co., 747 F.2d 885, 888 (3d Cir. 1984). While employees are not guaranteed a stress-free work environment, employees are protected from "calculated efforts to pressure [them] into resignation through the imposition of unreasonable harsh conditions." See Gray v. York Newspapers, Inc., 957 F.2d 1070, 1083 (3d Cir. 1992) (quoting Bristow v. Daily Press, Inc., 770 F.2d 1251, 1255 (4th Cir. 1985)). In cases of racial discrimination, courts have found constructive discharge based upon

patterns of discriminatory treatment.  See Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1084 (3d Cir. 1996) (continuous discrimination without other precipitating facts was sufficient to support constructive discharge claim).  Claims of constructive discharge are "a heavily fact-driven determination," Levendos v. Stern Ent., Inc., 860 F.2d 1227, 1230 (3d Cir. 1988), requiring the employee to show conduct that would "compel a reasonable person to resign," Duffy, 265 F.3d at 169.

Jenkins argues that her resignation was reasonable in light of the continuous discrimination she faced at LNL.  Jenkins testified that this discrimination took many forms, including being misclassified as an independent contract (despite repeated requests to be paid as a W-2 employee), having $33,000 in wages withheld, Allouche stating that he wanted to hire a white face for the company and instructing Jenkins to hire white employees, and repeatedly being called racial slurs.  Resp. at ¶¶ 2, 30, 12, 14, 17, 26, 27, 45.  In contrast, LNL denies that Jenkins was misclassified, unpaid, instructed on racial preferences in hiring, or the subject of racial remarks.  Def. Ex. 1, Allouche Dep. at 32:21-24, 122:20-123:6 ECF 57-5.

Lastly, both Bouclier, a white woman, and Preston, a black man, resigned from their positions as CEO.  Notably, Preston testified that he resigned from LNL because "[t]here were a lot of things that Larry [Allouche] would do and say that made [him] feel uncomfortable as a professional, and it made [him] feel uncomfortable as a black man."  Preston Dep. at 83:2-8.  At the same time, other employees, of different races, remained at LNL following Jenkins' resignation.

For purposes of this Motion, the Court will assume that Jenkins has established a prima facie case of racial discrimination in violation of Title VII.

11

### 4. Legitimate Nondiscriminatory Reason

LNL offers a legitimate, nondiscriminatory reason for not promoting Jenkins to CEO or *de facto* CEO, Jenkins did not have a college degree, a requirement to be CEO of a group home in Pennsylvania. Reply at ¶ 3. LNL does not, however, provide a legitimate nondiscriminatory reason for misclassifying, not paying, and using racist slurs against Jenkins or for intentionally hiring and promoting white individuals. Instead, LNL denies these allegations. Notably, LNL does not dispute that Jenkins, Bouclier, and Preston testified to many of these events.

### 5. Pretext

Whether LNL's proffered reason for not promoting Jenkins to CEO is pretext is a question for the jury. State regulations require a CEO to have a college degree. See 55 Pa. Code. § 6400.43. At the same time, Bouclier testified that the regulations had changed, allowing an individual without a college degree to be CEO if someone on the executive team met the regulations' qualifications requirements. Bouclier Dep. at 37:16-39:15. Even if Bouclier's understanding of the regulatory requirements is inaccurate, whether LNL could have successfully applied for a waiver to this provision or promoted Jenkins to an analogous role are factual questions for the jury. More importantly, LNL denies, but does not provide a legitimate nondiscriminatory reason for the misclassification, unpaid wages, racist hiring practices, and racial slurs that Jenkins testifies led to her constructive discharge. Accordingly, whether Jenkins can show pretext is a question for the jury.

The presence of disputed, material facts requires the Court do deny Defendant's Motion as to Jenkins' Title VII racial discrimination claim.

B. § 1981 Racial Discrimination (Count III)

Section 1981 states that all persons have the right to make and enforce contracts to the same extent that right "is enjoyed by white citizens." 42 U.S.C. § 1981 (2006). Thus, § 1981 prevents "racial discrimination in the making and enforcement of contracts. Brown v. Philip Morris, Inc., 250 F.3d 789, 796 (3d Cir. 2001). Discrimination claims brought under § 1981, like those brought under Title VII, proceed under the McDonnell Douglas burden shifting framework. See Brown v. J. Kaz, Inc., 581 F.3d 175, 181–82 (3d Cir. 2009) ("the substantive elements of a claim under section 1981 are generally identical to the elements of an employment discrimination claim under Title VII.").

6. Prima Facie Case

A plaintiff can establish a prima facie case of purposeful racial discrimination under § 1981 by showing "(1) that he belongs to a racial minority; (2) an intent to discriminate on the basis of race by the defendant; and (3) discrimination concerning one or more of the activities enumerated in § 1981, including the right to make and enforce contracts." Pryor v. Nat'l Coll. Athletic Ass'n, 288 F.3d 548, 569 (3d Cir. 2002) (internal quotation marks omitted); Philip Morris Inc., 250 F.3d at 797.

That Jenkins belongs to a racial minority is undisputed.

The second element, intentional discrimination, is disputed by the parties. To survive summary judgment, Jenkins must have "produced some evidence that would demonstrate that [LNL] intentionally discriminated against her because she belonged to an 'identifiable class [] of persons who was subject to intentional discrimination solely because of [her race].'" Pamintuan v. Nanticoke Mem. Hosp., 192 F.3d 378, 385 (3d Cir. 1999) (quoting St. Francis College v. Al-Khazraji, 481 U.S. 604, 609 (1987)). Jenkins produced significant evidence to this effect. For

13

example, Jenkins testified that Allouche hired Bouclier as CEO because he wanted a "white face of the company." Def. Facts II at ¶ 11. Jenkins' testimony is bolstered by that of Bouclier and Preston who recounted various instances where Jenkins was subject to blatant racial discrimination, including Allouche and his wife calling Jenkins lazy, a "black monkey and dog[]," and a "black bitch" and telling Jenkins to "get the fuck off her ass." Def. Facts II at ¶¶ 17, 40, 41; Jenkins Dep. at 499:13 – 500:14, 512:19 – 513:8. Bouclier also described a conversation in which Allouche said to Bouclier, "I can't believe – look at the way they are acting. Is this the way black people act?" in reference to Jenkins and another black employee. Bouclier Dep. at 52:20 – 53:17. While LNL denies many of the outlined instances, this evidence is sufficient to create a factual dispute as to whether Jenkins suffered intentional discrimination.

As to the final element, Jenkins acknowledges that she must prove that her right to make or enforce "a contract for work [] was impaired by the Defendant and that race was a determinative factor in the defendant's decision." Resp. at 14. Jenkin asserts that "it is undisputed that [she] had the right to enforce contracts [] for 1981 purposes." Id. LNL does not address Jenkins' right to make or enforce a contract in any of its summary judgment briefs. As such, the Court will consider the final element undisputed.

Given that Jenkins has produced credible evidence of intentional racial discrimination, and the remaining elements of the prima facie case are undisputed, it is now a factual question for the jury. To the extent that Jenkins must also show the substantive elements of a Title VII discrimination claim[1], as discussed, Jenkins has produced sufficient evidence to preclude summary judgment.

---

[1] See Chandler v. La-Z Boy, Inc., 621 F.Supp.3d 568, 574 (E.D. Pa. 2022) (Gallagher) (the Court noted that a plaintiff asserting a § 1981 discrimination claim must show (1) that she belongs to a racial minority, (2) an intent to discriminate on the basis of race, and (3) discrimination regarding activities enumerated in § 1981. The Court further noted that the substantive elements of § 1981 and Title VII claims are nearly identical and focused its

### 7. Legitimate Non-Discriminatory Reason & Pretext

As with Jenkins' Title VII discrimination claim, LNL proffered a legitimate nondiscriminatory reason for its decision not to promote Jenkins to CEO. However, Jenkins provided sufficient evidence that this justification was simply pretext. Moreover, LNL denied Jenkins' allegations of misclassification, unpaid wages, racist hiring practices, and racial remarks, of which the Court finds that Jenkins has produced credible evidence creating a material factual dispute. Accordingly, summary judgment is denied as to Jenkins' § 1981 Racial Discrimination claim.

### C. Hostile Work Environment: Title VII (Count I) & § 1981 (Count III)

To demonstrate a prima facie case of hostile work environment under Title VII and § 1981 a plaintiff must show that (1) she suffered intentional discrimination because of her race, (2) the discrimination was severe or pervasive, (3) she was detrimentally affected by the discrimination, (4) a reasonable person in like circumstances would be detrimentally affected by the discrimination, and (5) there is respondeat superior liability. See Castleberry v. STI Grp., 863 F.3d 259, 263 (3d Cir. 2017) (quoting Mandel v. M&Q Packaging Corp., 706 F.3d 157, 167 (3d Cir. 2013)).[2] [3]

### 1. Intentional Discrimination

As previously explained, Jenkins has produced sufficient evidence to create a factual dispute on the issue of intentional discrimination.

---

analysis on whether the plaintiff's constructive discharge qualified as an adverse employment action under Title VII's third prima facie element).

[2] Castleberry, a § 1981 case, applied the standard announced in Mandel, a Title VII case, because "[i]n employment discrimination cases, [§ 1981] claims are subject to the same analysis as discrimination claims under Title VII of the Civil Rights Act of 1964." Castleberry, 863 F.3d at 263.

[3] As previously discussed, material facts remain that preclude the Court from granting summary judgment on Jenkins' Title VII claims on the bases that Jenkins was an independent contractor or that LNL employed less than fifteen individuals.

### 2. Severe or Pervasive

The second factor only requires conduct that is severe **or** pervasive as "some harassment may be severe enough to contaminate an environment even if not pervasive; other, less objectionable, conduct will contaminate the workplace only if it is pervasive." Castleberry, 863 F.3d at 263. For example, the Third Circuit has held that a single use of the "n-word" can be sufficiently severe to establish a hostile work environment claim. Id. at 264.

Jenkins, Bouclier, and Preston all testified to Allouche's practice of directing racially charged language at black employees. Jenkins further testified that Allouche instructed her to hire white employees and made Bouclier CEO because he wanted a "white face" of the company – all allegations that LNL denies. Whether such conduct occurred requires a jury to weigh the credibility of the parties' conflicting testimony, and if believed, to make a factual determination as to whether any individual incident was sufficiently severe, or their cumulative effect was pervasive.

### 3. Detrimental Affect

As "[s]ubjection to racist remarks within ones place of employment . . would certainly create a hostile working environment to a reasonable individual," Felder v. Penn Mfg. Indus., Inc., 303 F.R.D. 241, 244 (E.D. Pa. 2014) (McHugh), if a jury finds Jenkins' testimony credible, it could conclude that Allouche's conduct detrimentally affected Jenkins and would likewise detrimentally affect an objectively reasonable person in like circumstances.

### 4. Respondeat Superior Liability

The fifth factor subjects an employer to "to vicarious liability to a victimized employee for an actionable hostile work environment created by a supervisor with immediate (or

16

successively higher) authority over the employee." Faragher v. City of Boca Raton, 524 U.S. 775, 807 (1998).

Jenkins testified that Allouche, and sometimes his wife, were responsible for the racial discrimination that gave rise to a hostile work environment. Jenkins further testified that because of this hostile work environment she suffered an adverse employment action, constructive termination.[4] When a discriminatory act results in a tangible employment action, employers are vicariously liable. See Burlington Ind., Inc. v. Ellerth, 524 U.S. 742, 760-61 (1998) ("Every Federal Court of Appeals to have considered the question has found vicarious liability when a discriminatory acts results in a tangible employment action."). If a jury finds that Allouche engaged in discriminatory conduct that caused Jenkins to resign, LNL will be vicariously liable.

Even if Jenkins did not suffer an adverse employment action, as owner, Allouche's conduct may be imputed to LNL. In interpreting Faragher, the Seventh Circuit held that owners may be treated as an employer's proxy and their actions may be automatically imputed to the employer. See Johnson v. West, 218 F.3d 725, 730 (7th Cir. 2000) (citing Faragher, 524 U.S. at 789-90)). Courts in this Circuit have relied on the Seventh Circuit's analysis to hold that a fifty-percent owner and president "falls squarely within the class of persons whose conduct could be automatically imputed to the employer according to the United States Supreme Court." Strauser v. Jay Fulkroad and Sons, Inc., 2005 WL 2020636, at *8 (M.D. Pa. Jul. 28, 2005).

Factual disputes prevent the Court from granting summary judgment on Jenkins' Title VII and § 1981 hostile work environment claims.

---

[4] As discussed, material facts regarding Jenkins' constructive discharge claim remain.

17

### D. Pennsylvania WPCL (Count IV)

Jenkins testified that LNL failed to pay her $33,000 in wages. Resp. at ¶ 30. In contrast, LNL asserts that Jenkins was paid in full, and that Jenkins cannot sustain a WPCL claim because she was an independent contractor, not an employee. MSJ at 22, Reply at 10.

The WPCL does not create a right of compensation but rather "provides a statutory remedy when [an] employer breaches a contractual obligation to pay earned wages." DeAscencio v. Tyson Foods, Inc., 342 F.3d 301, 309 (3d Cir. 2003). Importantly, the WPCL "applies to back wages already earned." Allende v. Winter Fruit Distrib's Inc., 709 F.Supp. 597, 599 (E.D. Pa. 1989) (Newcomer). To prove a violation of the WPCL, "a plaintiff must establish 'that he was contractually entitled to compensation and that defendant failed to pay the required compensation.'" Bair v. Purcell, 500 F.Supp.2d 468, 493 (internal citations omitted).

Jenkins' WPCL claim requires the Court to address three questions: (1) what Jenkins' employment status was, (2) was there a valid employment agreement, and (3) did LNL fail to pay required compensation.

As to the first issue, the WPCL does not provide a statutory definition for the term "employee." In determining whether a worker is an employee under the WPCL, Pennsylvania courts have looked to the Unemployment Compensation Act and the Pennsylvania Workers' Compensation Act for guidance. See Estate of Accurso v. Infra-Red Servs. Inc., 805 Fed. App'x 95, 100 (3d Cir. 2020) (non-precedential). Under these two Acts, courts assess the following factors to determine whether a worker is an employee or independent contractor:

> The control of the manner that work is to be done; responsibility for result only; terms of agreement between the parties; the nature of the work or occupation; the skill required for performance; whether one employed is engaged in a distinct occupation or business;

which party supplies the tools; whether payment is by the time or by the job; whether the work is part of the regular business of the employer, and the right to terminate the employment at any time.

Id. (internal citations omitted). As discussed in the context of Jenkins' Title VII claims, Jenkins was identified as an independent contract on payroll records, Def. Ex. 4, ECF 57-9, Jenkins' employment contract was not signed by LNL, Def. Facts at ¶ 5, and LNL contends that Jenkins simultaneously worked for LNL and other agencies, Def. Facts II at ¶ 2. At the same time, the parties agree that LNL provided Jenkins the tools needed to complete her work, controlled the location and manner of work, and paid Jenkins by her time. The parties likewise agree that Jenkins' role required sophisticated skills, was part of LNL's regular business, and involved hiring and paying other employees. Def. Facts II at ¶¶ 2, 3, 5, 8, 29. As such, material facts remain that preclude granting summary judgment on the basis that Jenkins was an independent contractor under the WPCL.

Turning to the second issue, an agreement is enforceable under Pennsylvania law if (1) both parties manifest an intent to be bound by the agreement, (2) the terms of the agreement are sufficiently definite, and (3) there is consideration. See Channel Home Ctrs., Div. of Grace Retail Corp. v. Grossman, 795 F.2d 291, 299 (3d Cir. 1986). Jenkins asserts that she and Allouche reached a verbal agreement, which she memorialized in writing, titled "Binding Contract with Darlene Jenkins," and sent to Allouche with her signature, and which Allouche "put[] off signing." Jenkins Dep. at 380:4-381:24. LNL likewise contends that there was no signed employment agreement. Def. Facts at ¶ 5. However, neither Jenkins nor LNL dispute the existence of a valid employment agreement in their summary judgment briefing. Reviewing the evidence of record, the Court finds that there are disputed material facts as to each element of

contract formation that preclude summary judgment. Jenkins testified that her and Allouche came to a verbal agreement, that included the terms of Jenkins' employment, under which Jenkins is entitled to $33,000 in unpaid wages. Id. at 380:4-381:24, 465:4-14. If believed, a jury could find that the verbal agreement, committed to writing, manifested both parties' intent to be bound, the terms of which were sufficiently definite, and which provided Jenkins payment in exchange for her work. While the Court recognizes that a plaintiff must have a valid employment agreement to pursue a WPCL claim, where as here, the existence of such an agreement is disputed by the parties, summary judgment on this basis is inappropriate. See McGoldrick v. TruePosition, Inc., 623 F.Supp.2d 619, 632 (E.D. Pa. Mar. 17, 2009) (Joyner) (denying summary judgment on WPCL claim where the employment agreement was unsigned on the basis that there were disputed material facts as to whether the parties intended to be bound by the document).

Finally, Jenkins presents evidence that LNL failed to pay her the wages owed under the agreement. Jenkins contends that she only received three to four paychecks throughout her employment with LNL and is owed $33,000 in unpaid wages. Jenkins Dep. at 465:4-14; 466:10-15. Jenkins also produced the deposition testimony of Bouclier and Preston in which both testified that LNL did not pay their full wages. Bouclier Dep. at 27:8-29:19; Preston Dep. at 42:20-43:15, 61:15-24. LNL argues that Jenkins was paid in full. Def. Facts II at ¶ 30. As the parties dispute whether Jenkins was paid all wages, the Court cannot grant summary judgment on Jenkins' WPCL claim.

## V. **CONCLUSION**

For the reasons stated above, LNL's Motion for Summary Judgment is **DENIED**.

\\adu.dcn\paed\PHL-DATA\Judge_Baylson\CIVIL 23\23-423 Jenkins v. LNL Home Services\23-423 MSJ Opinion.docx